Good morning, ladies and gentlemen. Our first case for argument this morning is Brumit v. Granite City. Mr. Gage. Thank you, Judge Easterbrook, and may it please the Court. This case presents a challenge to an ordinance under which Granite City would force private landlords to evict entire households if any member of the household committed a felony anywhere within city limits. In this way, the city violated at least three constitutionally protected rights. Mr. Gage, before we get too far into the merits, we need to be sure that we have an ongoing case or controversy that's justiciable. Your clients have moved out of Granite City, I take it? Correct. So there's no prospective relief that's possible? That's correct, Your Honor. What damages did your clients suffer? Our clients have pleaded nominal damages in the complaint, Judge Easterbrook, which under the Supreme Court's ex-guenon decision is enough to… Well, the question for nominal damages is whether your clients suffered any harm at all from a completed wrong. If I understand the situation correctly, as soon as your clients received a notice of eviction, they got a temporary restraining order prohibiting the eviction, so they were never evicted. Am I understanding it correctly? So it's certainly true, Judge Easterbrook, that they were never evicted, but if I can perhaps correct you on… All right. So the question then is, is it possible to get nominal damages when the complaint of harm never occurred? So I would say two things, Judge Easterbrook. First, factually, there was a three to four month window between when the police department issued the compulsory eviction demand and when they got the temporary restraining order from the federal court, and during that period they had to, for example, go to City Hall, spend time preparing for the hearing, and so I think… That's like saying that there's jurisdiction over a suit. If the plaintiff's hired a lawyer, right, that's not enough to make for an Article III case for controversy. I'd like you to address my question, which is whether – there are a lot of nominal damages cases – whether nominal damages are properly awarded where the complaint of harm never came to pass. So I would say yes, Judge Easterbrook, certainly in this context, and if I can explain. Well, what's your best case for that? Well, I would point to Uzair Bunam, but… Now, none of us knows how to pronounce that case, but in that case the person was actually prevented from talking on campus. The harm came to pass. I'm looking for situations where there's a notice, but there's no harm that ever comes to pass. So I am confident there are certainly circuit court cases that say that Judge Easterbrook, I will confess, I can't think of any right off the bat, but I think the more fundamental… Well, it's not simply that you can't think of any right off the bat. It's that I looked and couldn't find any. Your brief doesn't cite any. I couldn't find any. Now, maybe there are some that I didn't find. Maybe I didn't look hard enough, but it's a pretty serious problem where there was no eviction order in the end, and this case, nominal damages have to depend on the proposition that they can be awarded even though the harm never occurred. So if I could say two points on that, Judge Easterbrook.  First, to the extent the court does have concerns on this, we'd ask for the opportunity to do supplemental briefing, because I am confident we can point you to cases that will satisfy. The other point I would make, though, is that there's no dispute, I think, that there was enough of a harm for us to file a federal lawsuit in the first case. There's no problem with that. You'll get no fight there because the harm was impending. The problem was that that was the closest it got. It was impending, but it never happened. So I would resist that, Judge Easterbrook. I think during the period when the government is coming in and saying you need to leave your home, we are forcing your landlord to evict you, if that's enough of an injury, whether it's impending or completed, to get into court for prospective relief, I would submit that that's enough. We're not dealing with prospective relief. That is clearly moot. If you're going to say there are nominal damages where the harm never happens, take the private law analog. The bank serves a notice of eviction on somebody for not paying the mortgage, and then before an eviction order is entered, the bank says, well, we're taking it all back. Are there nominal damages in those cases? There are hundreds of thousands of those kinds of cases. Do they lead to awards of nominal damages? Now, as you say you're confident you can find such cases, fine. There should be plenty, because the number of people who are served with eviction notices by landlords or vacator notices by banks is in the millions. It should be possible to find those cases. Judge Easterbrook, I think certainly this case where you have the government taking an action that we submit is a constitutional violation and is actively enforcing the law against someone, we think that active enforcement, whether or not it culminates in the ultimate irreparable injury, just as it's enough of an impending harm or a realized harm to get into federal court on prospective relief. Well, let me give you another one. The prosecutor files an indictment, gets an indictment from the grand jury, but the defendant is never arrested, remains free. The indictment is later dismissed. Can that person get nominal damages for the indictment that was issued and dismissed without an arrest? I mean, I think there are lots of places to go and look that seem similar to this, but I will invite both parties to file supplemental briefs. Let's go to the mayor. Sure. I would be happy to, Judge Easterbrook. Mr. Judge, I'm sorry, Alana. Before we do, you know, one of the places that we look to to see if a plaintiff has alleged a completed harm or or have suffered a harm is the complaint. And I looked through the complaint and I could not find any allegation in your complaint that the plaintiff actually suffered a completed harm or a past harm. There's no allegation of, say, emotional harm. There's no allegation of any additional expenses that the government's action required them to incur. And so I wondered whether you could point me to a place in the complaint where you think you allege that there was some sort of completed harm or some sort of harm that was taking place other than the imminent pending harm of eviction. Sure. So, Judge Lee, you're correct. We didn't plead emotional distress or anything along those lines. I will say that during discovery, you know, we developed the record that, for example, they did have to take time, of course, to go to City Hall and do other things. We're not saying they're entitled to millions of dollars of damages, but I think on remand, the district court would have the discretion under Rule 54C, for example, to award at least some modicum of compensatory damages for the time spent defending against what we submit is an unconstitutional enforcement action. But I think just to kind of circle back to what I think is my more fundamental proposition, my read of Uzeg Bunam and the other circuit court cases, which I confess I can't point you to right now, is that the courts didn't slice and dice whether a harm was completed versus impending enough to get into federal court. If you have enough of an actual or impending injury to get into federal court for prospective relief, my read of the cases is that that is enough at least for nominal damages. On to the next, I guess. What we don't know is how many people were deterred from committing felonies because they did not want to risk having their families evicted. Is there any data at all in the record on whether crime decreased after the law went into effect? I do not believe there is any data on that point, Judge Rovner. I can point you to some annual reports that Granite City created on how many crime-free or compulsory eviction notices were issued on an annual basis. And we also have data on kind of an estimate of the overall number of felonies that were charged within Granite City during each year, which we have in chart form in the opening brief. We know that only 10% of felonies triggered a compulsory eviction. Is there a way to know why the other 90% did not? Were they all living in owned properties or were they people who really didn't live in Granite City at all? I mean, what's the story with all of that? Do you know? Sure. I mean, I can tell you what I believe the answer to your question is, is that that other 90%, those were people who either lived in Granite City in owner-occupied homes or in homes subject to a mortgage, or they lived in any kind of home somewhere other than Granite City. And I don't understand the city to dispute those stats, the idea that, you know, at the end of the day, 90% of felonies in Granite City weren't actually implicating the law in the first place. But I do want to emphasize, Your Honors, that in our view, this case doesn't rise or fall on those particular stats. You know, even if the stats were a little bit more favorable to the government in this case, our fundamental submission is that whether we're looking at this through the due process clause or through associational rights precedent, the government doesn't get to engage in collective household-wide punishment against people who haven't committed any offenses. And I guess touching briefly on the due process. Are you saying that the analysis would be different if it required a conviction before eviction? I don't think so, Judge Rovner. And if I'm understanding your question correctly, if, for example, you had a family of four people and the city waited until that one person who shoplifted from Walmart across town were convicted before the city ordered everybody out of the house. Now, our submission would be that raises the same due process concerns because ultimately you're punishing those three other members of the household for a crime they had nothing to do with. Is there anything in the record about whether municipalities increase crime by creating housing instability? No, Your Honor. I mean, I would point you to the NAACP and the ACLU's brief, which I think touches on that. But fundamentally, I suspect that the record, the facts would bear that out for all the reasons laid out in that brief. But our fundamental submission is that regardless of whether this particular kind of law decreases crime or increases crime or has no effect on crime, governments just cannot, under our system of ordered liberty, punish person A for the crimes of person B. And that at base is what Granite City was doing here. And I don't understand the district court or Granite City to disagree with that fundamental proposition. I wonder, though, the Supreme Court in Rucker dealt with the argument you're now making was exactly what the Ninth Circuit said in Rucker and, of course, exactly why it got reversed. If your argument is right in the form in which you present it, then Rucker was not only wrongly decided, it was an unconstitutional decision. Well, obviously, the justices didn't think that. And we are, in the Constitution's term, an inferior court. So the hard question for you, I think, after Rucker, is why it should matter that the government acts as a regulator rather than as the payer of a subsidy, right? Why does that matter? Because the broad form of your argument just doesn't work with Rucker. You need to tell us why the regulatory structure matters. So I think it matters, and not to sound too lawyerly, Judge Easterbrook, I think it matters because the court said it mattered in Rucker. Well, it said it might matter, right? The court said, that's a different problem. We're not resolving it today. Well, this is that problem. Absolutely, Your Honor. And I think Rucker kind of does a good job of marking out the limits of our due process claim. Because in Rucker, of course, the question was whether a public landlord could have a contractual right that they could exercise or not in its discretion to terminate a lease if a tenant or a household member commits a crime. I think the word discretion is used a half dozen times in the opinion. And we would have no due process quarrel if a city in Illinois passed an ordinance saying landlords in our town, if they want to, if someone commits a crime on their property or if a householder commits a crime in the city, landlords have the option to exercise their contractual discretion to terminate that lease. We would have no quarrel with that. Illinois law already provides for that in certain circumstances. And that, I think… Even if that term was not in the lease. Yes. I mean, that might raise other problems, but it certainly would not raise a due process problem. It might raise other problems. You know, I was looking through your brief wondering where I was going to find the argument under the Contracts Clause. Because it appears that the city has tried to override lease contracts. But there wasn't any argument. There was not any Contracts Clause argument, Judge Easterbrook, and I'm not going to say it's a losing argument. But my understanding is that when the ordinance dictating the terms of a contract predates a contract, it's a pretty uphill battle in the Contracts Clause context. And we are perfectly comfortable with the rightness of our due process and our associational rights claims. And I do think, as I said, if we're analogizing to Rutger, the proper… Well, look, given that the Ninth Circuit flopped on its due process argument, and given Dobbs, we are, as an inferior court, not exactly being invited to make up new rights in the terms of substantive due process. You might concentrate on the First Amendment. I would be happy to, Judge Easterbrook. And I do think the doctrinal pathway under the associational rights claim is certainly perhaps more straightforward than our substantive due process claim. Ah, yes. Because I think there's a lot of… Under Supreme Court current law, that's your best theme. I am happy to win under the associational rights claim, Your Honor. I think, in fact, there's a lot of common ground between the city and the plaintiffs on the associational rights claim. Because the city, I think, agrees that when it comes to expressive association and intimate association, at a minimum, the Supreme Court has said that burdens on those two types of associations get special protection under this precedent. Now, we would argue that's a little bit too narrow in the context of collective punishment, but I think the parties agree that's the bare minimum. The city, as I understand it, too, does not meaningfully dispute that the household unit is a classic intimate association under cases like Rotary Club International, Roberts v. Jaycees. The city disputes that in one sentence in its brief, but I don't think that's seriously at issue. So is what you are saying that if the brummets had taken in a boarder with whom they were not intimately associated at all and he stole the van, you're saying that that would change the nature of your associational rights claim? So under the current Supreme Court precedent that kind of has the intimate and expressive paradigm, I think that might be a closer question, Judge Rovner, because then you have the commercial aspect and you could be making an argument that, well, they'd let anybody take that room if the person paid the rent. But here, of course, we're talking about their adult daughter. Oh, no, I understand. I'm just— Yeah, so I think certainly if we're in that expressive intimate paradigm, that would be a slightly closer question, Judge Rovner, yes. That, of course, would tee up directly the due process claim, which I won't belabor. But on the final— What? I didn't mean to cut you off, Your Honor. No. Okay. On the final point of common ground— I'm thinking how smart you are. Go ahead. Thank you, Your Honor. The final point of common ground is that I don't understand the city to dispute that, in fact, its law directly targeted people based on that intimate household association. I think that's stated most clearly at page 40 of their brief. So I think the real dispute on this claim is whether a law that forces people out of their homes based on a classic intimate association, whether that law directly and substantially burdens associational rights. And I won't belabor the arguments we made in our brief on that, but I do think NAACP versus Claiborne Hardware answers that question decisively in our favor. Now, Claiborne Hardware, of course, involved expressive association, not intimate association, but we see it as kind of two doors into the same room. And the lesson from Claiborne Hardware is that once you're in that room, that expressive intimate room, then the government's imposing civil liability either on the association as a whole or on one member of the association purely for associating with a bad member of the association. The fundamental teaching from Claiborne Hardware is that that violates associational rights. The analysis of how and to what extent the ordinance burdens that associational relationship or those associational rights, to me, somewhat depends on what impact it would have on those associational rights. So, for example, hypothetically, say that the family were able – they were evicted, but they were able to move just down the street and stay together, which I don't think the ordinance prohibits. They just sign a new lease, and they would just go on their way. And sure, there would be transactional costs, but putting that to the side for a second, in such a fact scenario, one can envision an argument that, you know what, there really is minimal. There's any burden because you're not infringing upon that relationship in any way. They just have to move. So, they can stay together. They can still have their relationships. And that, you know, whether they move upstairs, say, in a multifamily unit or across the street, that it really doesn't infringe in that scenario that much on those associational rights. And so I was wondering what the response to that is. So, my response, Judge Lee, is that the reason they would have to move is because they've suffered an irreparable harm at the hands of the government, a classic irreparable harm of losing their home. And yes, they can pick up and try to find a house somewhere else. But aren't those two rights different, though? I know you're trying to connect those, right? Sure. But in some respects, there's the right to live where you want to live, right? And separately, there's a right – those associational rights. And it seems like the facts of this case and your argument seems to kind of not conflate but kind of inextricably link those rights together. When analytically, I don't know if that's really the proper paradigm to look at that. Well, so I think the question really is, is the city burdening someone's intimate association? Are they visiting governmental burdens on you because of your intimate association? And here, I think the fact that the burden is an irreparable harm that certainly people can try to recover from is a classic example of the kind of burden that we're talking about. And here, too, I think Claiborne Harbor answers that in our favor because there, you know, there's no suggestion that the civil tort liability imposed on the NAACP prevented the NAACP from associating with its Mississippi members. It was enough that the Supreme Court said and reiterated in Ling v. UAW, it was enough that the government was imposing liability on the association as a whole or on one person in the association based on the acts of another. And the court recognized that kind of as an obvious and inherent burden, even if, for example, the NAACP could have paid it and could have taken other steps. I see my light is on, so I thank you, and I ask the court to rehearse. Thank you, counsel. Ms. Phillips. Good morning. Oh, my apologies. May it please the court. Judge Easterbrook, members of the panel. I am here asking the court to affirm the district court's decision in this matter, obviously on the grounds of the two reasons. We have to decide whether we have a justiciable controversy. I'm going to give you an opportunity to address this in supplemental filings, but do you have any thoughts now in light of the previous argument? Well, I do, Your Honor, in terms of in the record, I actually did previously file a motion to have the matter dismissed as moot. And as part of that, part of the argument integrated into that was the fact that there had not been a harm suffered by the time that the ordinance changed. I think that that's part of the record here before us is that ultimately the ordinance changed. Prospective relief is off the table for multiple reasons. There's no reason to discuss that in the supplemental memos. What we're worried about is nominal damages for what happened in the past. That's what we would like you to address. Yes, Your Honor. And likewise, I'm not going to attempt to say the name of that particular case, but that was one that we had been monitoring at the time that we were waiting for a ruling from the district court. And that was a continuing concern at that point, although we did not cross-raise it in our briefs for reasons that the matter was dismissed to our benefit. I must say that I am now very seriously concerned. The appellate briefs are required to discuss jurisdiction. And you tell me now you were aware of a potential mootness problem. You raised a mootness problem in the district court, and you elected not to raise it here because you'd won on the merits and you like that better. Your brief doesn't mention mootness. It says that the plaintiff's jurisdictional statement is complete and correct. You have an ethical obligation to the court to address jurisdiction. And what you're telling me, maybe I'm wrongly interpreting you, is that you knew there was a jurisdictional problem, and you deliberately did not address it. If I may respond, Your Honor, I'm sorry. I think I misspoke there. Your Honor, what I was indicating was my understanding of the ruling that came down from the U.S. Supreme Court was that nominal damages would save the claim. And I understand that you were questioning. When the harm ever came to pass. And I understand that concern. And I'm also asking for the right to supplementally brief. But that was the understanding at that point in time is that that was sufficient. We were actually monitoring that particular case to see a direction for how the court would lean and understood that to mean that nominal damages would be sufficient. No, we're going to have to have this addressed. But I must say I'm disappointed in both sides for not having addressed this. This is not something a court of appeals should have to raise on its own. My apologies, Your Honor. I understand. Now, I could buy a home in Granite City. Right, Ms. Phillips? And I could fill it with felons or at least as many felons as zoning will allow. I could put mom, dad, grandma, grandpa, the kids in there. Whole family. Whole family of felons living with me under one roof. And that's no problem, right? And in your scenario, Your Honor, I want to make sure that I understand in your hypothetical that your question is that felonies were committed prior to living in Granite City. Right. Yes, that would be correct. That is not something that was allowed to be taken into consideration as a prior arrest record under that factual pattern. It would have been a question of whether or not there was a crime committed after the signing of the lease addendum. You know, the plaintiffs raised, well, the appellants raised an interesting point in their brief. It would be a due process violation, would it not, to fine Mrs. Brummett $50 for her adult daughter's crime. Why is it not also a due process violation to evict her from her home for her adult daughter's crime? And, Your Honor, in terms of that question, I'm sorry. It is not a due process violation here because of when we go through the analysis, we do not see that there is a fundamental right in issue. I think if we could start with the analysis and we first assert that the collective punishment theme is not a fundamental right, and I understand the court's question to be, but if that is transformed through a $50 fine, does that then change that situation? And our position would be that it did not, that this has, in fact, been analyzed before and to, I believe it was Judge Easterbrook's point, to some extent was, in fact, raised in the Hudvey-Rucker opinion under different lines. But, in fact, there was no constitutional question at that point in time raised. It was accepted that it could be incurred in that way because of the signing of the lease addendum. And if getting rid of criminals is really the goal here, why not pass a law that no one convicted of a crime can live in Granite City, whether they own or rent their home? I mean, would that be constitutional? No, I do not believe that that would be constitutional. I think the difference is that we are focused on future crime deterrence under the obligation as a home rule unit of the state of Illinois under the Illinois Constitution. Safety, health, welfare is what we are allowed to regulate. And, in fact, home rule units can, in fact, and do, in fact, regulate licenses for landlords. And that's one point of distinction that I think – I'm lost here. If you think about Rucker, what the justices are effectively holding is that you can waive associational rights in exchange for a subsidy because that was the hook for the regulation in Rucker. You take the government's money. You have to live by its rules, even if you don't like the rules. But there's no claim here that there's any subsidy involved or any other benefit from the city that would allow a waiver analogy. So why don't you answer Judge Rovner's question by saying, yeah, we just have the right to say if you have a felony conviction, you can't live in Granite City, or if your daughter has a felony conviction, she can't live in Granite City with you. And if I can parse that out a bit because I think part of the issue in this case is, in fact, it's not a question of if you have a felony conviction coming into the city. It's a question of did you commit a crime while you were living in the city, which has a direct – Yeah, but why is that a constitutional difference? Imagine that Granite City says, if you've ever been convicted of a sex offense – and then now here insert all the things municipalities do for people who were convicted of sex offenses before they came to the municipality. This before-after wouldn't work for the limitations on sex offenders. And now this hypothetical is just asking you to extend this from sex offenses to, say, car theft. And again, I think the question is future deterrence. That's why I'm making that difference here is that we have an interest in future deterrence. That's not the rationale in the sex offense cases. No, no, it is not. And my apologies, but the purpose here is to take a look at what is within the control of the city and to protect the neighborhoods and the communities. I want to be clear, and I'm sure Judge Rovner wants to be clear. We're not asking whether this is a good law or a bad one or it has good effects or bad effects. We're asking about the limits of constitutional power, and that's really different. We are not a super legislature. So forget about good effects versus bad effects. Let's talk about the limits of a municipality's constitutional authority. And, Your Honor, in response to that, my understanding is that where we do not implicate a fundamental right, we have an ability to regulate. And why is there not a fundamental right of intimate association with members of your family? And that I can go to under that particular area. So I think under that particular area of the question, under the First or Fourteenth Amendment analysis, the family association, there is a— by the district court, they did find that there was a right of familial association between a parent and her adult child. The court then went to the next step of saying, well, when does that impact under—how do we get to rational basis review or strict scrutiny? And the question was the substantial and direct doctrine, the effect. And I apologize, Your Honor, have I gone beyond what your question is? I don't—I'm lost on what you're referring to. Okay. I was trying to go to the analysis that the court applied. I understand that the district judge analyzed this under what appeared to be a form of rational basis scrutiny. Correct. I don't see how that's possible for rights of intimate association because it effectively reads the free association guarantee of the First Amendment out of the Constitution. Every law needs a rational basis. Every single one. And if there's absolutely no difference in analysis between the First Amendment and any form of economic regulation, the First Amendment is dropped out. I don't believe that's the Supreme Court's holding. In the intimate association context, that's where we then look to the next step of does it directly and substantially impact that relationship? Because there are many laws and many ordinances which regulate the family association. And so to Your Honor's question, I think that's where we make that difference. That difference in analysis is that under the associational rights, you take that second step and say does it have a direct and significant impact? The cases that we relied upon for this are Stanglin v. City of Dallas and this court's ruling in Hemetman, which dealt with a requirement for someone to live within the city of Chicago. And in both of those instances, the courts went to look at what was the intent of the law. And the intent of this law, I do take issue with my opponent's characterization of it being targeted toward family association. That is not the intent of this law, as there can be many people who live on an individual basis. I have no idea how intent of the law gets in. The law is printed words on a page. Printed words on a page don't have any intent. The people who enacted it might have had any intent, but it's pretty standard doctrine that their intent doesn't count for a hill of beans, except perhaps in race discrimination cases. So how is it getting in here? Under the direct and substantial analysis of what the purpose is. As I said, I don't even know what you're talking about. Okay. The direct and substantial analysis. What constitutional test is that? That articulated under Stanglin v. City of Dallas, as well as the Hemetman case here within the Seventh Circuit. That we're a right that is implicated as an association right, a familial association right. And this is the difference between the other types and the familial association. Is that you first look to what level of scrutiny will we apply, dependent upon whether or not. I think what you're saying is just a whole lot of extra words for the proposition that if the law doesn't burden intimate association, then there's no problem. But yes, that's fine. Drop all this other verbiage. Okay. Your problem is that this law, as at least the notice was sent out, says if your daughter comes to visit you in your home, you will be evicted. Most people would view that as a burden on having a visit from their daughter. Your Honor, that's where again, and I apologize that I'm redirecting to these other cases. But those other cases, when looking at that burden, look at when the law was enacted, what its purpose was. And I do believe the legislative process. Laws do not have purposes. They are words. They are ink on a page. People may have purposes. But you're going to have to explain to me why the intent of members of the Granite City Legislature matters in this case, given the normal constitutional rule that intent doesn't matter. That what matters is the language and its effects. It may be a better way for me to say this, Your Honor, and I apologize, is the actual wording of the ordinance, which discusses in the preamble that it is for the purposes of to regulate safety, health and welfare. It is not targeted to, as in Moore versus East Cleveland, where the consideration was whether or not the family itself was being defined. May I ask a very simplistic question, please? And it's this.  Are you. I understood. Okay. And maybe I'm, you know. But I understood that your contention is that the relationship between parents and a daughter. It's not an intimate association. Now, am I wrong? Am I right? Am I? Where am I? No, Your Honor, the district court found that there was an intimate association between a right to an intimate association between parents and an adult daughter. The district court found that and then went to the second level of the analysis, which I was discussing in terms of whether or not it then directly and substantially impacted that association. But you're not, you, you, Ms. Phelps, your client. You're not contending that the relationship is not an intimate association. No, we did not raise that, raise that on appeal. Rather, rather we. I certainly thought that you thought or you wrote that it did. I'm sorry, I can't, you know, find it right now. That it didn't interfere with the relationship. And we did at the district court. That is correct. At the district court, we raised, we raised the argument that there is a difference between the right to rear children of a certain age versus the right to association with an adult daughter. But that's off the table now. That's correct, Your Honor. Returning to the, the association question because. So, Ms. Phillips, what is your best argument that the ordinance at issue, the impact it has on the associational rights between a parent and their child are only incidental and do not amount to a cognizable burden or sufficiently burden to a raise constitutional issues? Thank you, Your Honor. In terms of that question, this again is an ordinance that does not seek to limit who may live together. It simply limits where they may live together. There was no attempt here to require that Ms. Brummett's daughter had to live in a location separate from her or that they were trying to redefine the city was not trying to redefine the makeup of their family home. But you would agree that, for example, if I'm a parent and I'm and my child or grandchild or some other relative has some let's some issues. I know they have substance abuse problems, right? And I would like to help them through their recovery. And to do so, I would like them to live with me. But I'm really worried because if they are caught buying drugs out in the street in Granite City, then all of a sudden I might be evicted. Why isn't that a burden, whether you call it substantial, whatever, let's call it a actionable burden on those familiar rights under the First Amendment? Because, again, returning to that, if you go to those line of cases, that is not what the focus it is not seeking to do that. And I understand the burden question is, why is it not a significant enough burden? So as to render the ordinance unconstitutional and it is it is our position in the city's position. That is because it goes across a class of people. It has individual effects, but the overall reach of the ordinance is to structure issues and limitations with respect to crime. It is not to define a family to say who can live together, who can't live together. So is it your argument that we should only look at what the stated intended purpose is and not look at the impacts and the real world effects of the ordinance? No, it is not, because under this argument that I've been raising here, then when you go to take a look at that step in the process, you have to compare whether or not that is what occurred here. The city's ordinance did not prevent the daughter from living with her mother. It only prevented all of the individuals if the eviction had occurred. It prevented all of the individuals at living at one particular address in a particular city that was being run. I thought you'd go back to Judge Lee's question. How would sending troubled teens out of the house, for instance, reduce crime? How would that help a crime problem? Well, and if we're talking about minors, there are limitations due to the Juvenile Crime Act of Illinois that cannot be raised as of more recent decisions in between the time frame that those decisions occurred and the termination of this ordinance in 2019. So the city did not have a policy of taking any steps in a situation that involved a juvenile due to the limitations of and the reasoning and rationale of the Juvenile Crime Act. Okay, so you couldn't send a 16-year-old out, but you could an 18-year-old? That would be correct, Your Honor. But it would not be the individual. It would be the entire household. Oh, I understand that. I see that my time has concluded. I respectfully ask that you affirm. Thank you. Thank you, Counsel. Mr. Gedge, we used a lot of your time talking about jurisdiction. I'll give you two minutes for rebuttal. Thank you, Judge Easterbrook, and I will return briefly to jurisdiction for a moment. Judge Lee, just to follow up on your question about allegations in the complaint, there are several allegations from around paragraph 75 through 81, which talk about the costs and the steps that the plaintiffs took to try to avoid that threatened eviction before this lawsuit was filed. We could absolutely have sought compensatory damages for those, but the goal here isn't dollars and cents, and so nominal damages is appropriate. But I'm happy to flesh that out in the supplemental brief. The final point I'll make is just to return to the burden on associational rights. And, again, I think NAACP versus Claiborne has the answer here. If the collective civil tort liability was enough of a burden on associational rights for the NAACP to win in Claiborne Hardware, then the threat of forced eviction is enough of a burden on intimate associational rights for the plaintiffs to win here. If the court has no further questions, we would ask that this court's judgment be reversed. Thank you. Well, the court gives the parties 14 days to file supplemental memoranda addressing the question whether we have an ongoing case or controversy. And those memoranda should focus on the question whether nominal damages are appropriate when the threatened harm doesn't come to pass. That is, I say they're due in 14 days, and when they're received, the case will be taken under advisement.